**FILED**

MAY - 2 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA and
ex rel. PRESCOTT LOVERN,

2710 THOMES AVE. SUITE 275

CHEYENNE, WY 82001

    *Relator,*

    v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, 751
BROAD STREET, NEWARK, NJ
07102;

DEUTSCHE BANK TRUST
COMPANY AMERICAS, 60 WALL
STREET,NEW YORK, NY, USA;

MERRILL LYNCH CREDIT
PRODUCTS, LLC, 250 VESEY ST,
NEW YORK, NY 10281;

MERRILL LYNCH L.P. HOLDINGS
INC. 250 VESEY ST
NEW YORK, NY 10281;

MERRILL LYNCH, PIERCE, FENNER
AND SMITH INCORPORATED, 250
VESEY ST,NEW YORK, NY 10281;

ZURICH  AMERICAN INSURANCE
COMPAN, ONE LIBERTY PLAZA,
165 BROADWAY, 32ND FLOOR
NEW YORK, NEW YORK 10006;

THERMO NO. 1 BE-01, LLC;
INTERMOUNTAIN RENEWABLE
POWER, LLC. KEARNS BUILDING,
SUITE 600,136 SOUTH MAIN

Cause No.

DEMAND FOR JURY

FILED UNDER SEAL

Case: 1:12-cv-00704
Assigned To : Sullivan, Emmet G.
Assign. Date : 5/2/2012
Description: General Civil

JURY ACTION

SEALED

2

STREET, SALT LAKE CITY, UT
84101;

RASER TECHNOLOGIES, INC., NOW
KNOWN AS CYRQ ENERGY, INC.
KEARNS BUILDING, SUITE 600
136 SOUTH MAIN STREET
SALT LAKE CITY, UT 84101

    *Defendants.*

## COMPLAINT

1.      Relator Prescott Lovern, on behalf of the United States of America, pursuant to

the qui tam provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"),

files this Complaint against Defendants, The Prudential Insurance Company of America

(Prudential), Deutsche Bank Trust Company Americas, Merrill Lynch Credit Products, LLC,

Merrill Lynch L.P. Holdings Inc. (MLE), Merrill Lynch, Pierce, Fenner and Smith Incorporated,

Zurich American Insurance Company, (Zurich) (collectively, the "Defendant Investors); Thermo

No. 1 BE-01, LLC, Intermountain Renewable Power, LLC., Raser Technologies, Inc.,

(collectively "Raser entities"); and, (all defendants collectively, the "Defendants or

Conspirators"), alleges as follows:

### I.    JURISDICTION AND VENUE

2.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This

Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This court

also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

3.      At all times material to this Complaint, Defendants, The Prudential Insurance

Company of America; Deutsche Bank Trust Company Americas; Merrill Lynch Credit Products,

LLC; Merrill Lynch L.P. Holdings Inc.; Merrill Lynch, Pierce, Fenner and Smith Incorporated;

Zurich American Insurance Company, regularly conduct substantial business within the District of Columbia, and made and are making significant sales within the District of Columbia. Defendants are thus subject to personal jurisdiction in the District of Columbia.

4.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants, The Prudential Insurance Company of America; Deutsche Bank Trust Company Americas; Merrill Lynch Credit Products, LLC; Merrill Lynch L.P. Holdings Inc.; Merrill Lynch, Pierce, Fenner and Smith Incorporated; Zurich American Insurance Company, transact business in this district.

## II.   PARTIES

5.      Relator Prescott Lovern is a citizen of the United States and is the original source of the facts and information set forth in this Complaint concerning activities of Defendants.

6.      Relator has provided to the United States Attorney disclosure of substantially all material facts underlying the allegations of the Complaint, as required by the False Claims Act, 31 U.S.C. § 3730(b)(2).

7.      The principal place of business of The Prudential Insurance Company of America is New Jersey. Prudential was the assignee and purchaser of the Thermo Note and 90% of the Equity Capital Contribution Agreement between MLE, Thermo No. 1 BE-01, LLC, Intermountain Renewable Power, LLC., and Raser Technologies, Inc.

8.      The principal place of business of Deutsche Bank Trust Company Americas is New York. Deutsche Bank was the administrative agent and collateral agent for the Equity Capital Contribution Agreement and subsequent agreements. Deutsche Bank received compensation from the Defendants for its services and it agreed to cooperate with the other Defendants on obtaining the Section 1603 grant.

9. The principal place of business of Merrill Lynch Credit Products, LLC and Merrill Lynch L.P. Holdings Inc., and Merrill Lynch, Pierce, Fenner and Smith Incorporated, are New York. Merrill Lynch Credit Products, LLC and Merrill Lynch L.P. Holdings Inc., were investors of Thermo No. 1 BE-01, LLC, Intermountain Renewable Power, LLC., Raser Technologies, Inc. Merrill Lynch, Pierce, Fenner and Smith Incorporated was the Class A Investor in Thermal No. 1.

10. The principal place of business of Zurich American Insurance Company is New York. Zurich was the assignee and purchaser of the Thermo Note with Prudential and the Equity Capital Contribution Agreement between MLE, Thermo No. 1 BE-01, LLC, Intermountain Renewable Power, LLC., and Raser Technologies, Inc.

11. The principal place of business of Thermo No. 1 BE-01, LLC, Intermountain Renewable Power, LLC, Raser Technologies, Inc., is Utah. The Raser entities filed for Chapter 11 bankruptcy on April 29, 2011. Raser is the parent company of Intermountain, which in turn is the parent of Thermo No. 1.

### III. INTRODUCTION

12. Relator Lovern brings this action on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, to recover United State Treasury funds paid to Defendants under Section 1603 of the American Recovery and Reinvestment Tax Act of 2009 because of Defendants' false and fraudulent application to the United State Treasury.

### IV. BACKGROUND AND FACTS

13. Raser began business in 2002 as an electric motor company. It was never successful in selling or licensing any of its few products, so in 2006 the company decided to dabble in geothermal wildcatting and geothermal power plant construction. During the ensuing

5

months, Raser leased various unproven geothermal properties. Raser's first attempt to construct a plant in Nevada in 2007 was a failure and was abandoned.

14.     In the first half of 2008, before the construction of a plant and without knowing the viability of the geothermal resource, Raser entered into to a geothermal power purchase agreement with the city of Anaheim, California, which was eager to obtain green energy due to California clean energy mandates to utilities.

15.     On August 31, 2008, Raser through its subsidiaries, Thermo No. 1 BE-01, LLC and Intermountain Renewable Power, LLC., (the Raser entities) entered into an "Equity Capital Contribution Agreement" and "Thermo Note" with Merrill Lynch L.P. Holdings, Inc. (MLE) that included debt and tax equity capital contribution of $31,175,092.00 to complete the construction of its speculative geothermal plant, Thermo No. 1. Upon information and belief the money was provided through Merrill Lynch Credit Products, LLC. After a previously committed, subsequent Second Funding Date Capital Contribution, MLE ended up with a 99% secured ownership of the Class A Shares of Thermo No. 1. MLE subsequently transferred their interest to Merrill Lynch, Pierce, Fenner and Smith Incorporated (MLP). MLP owns MLE and Merrill Lynch Credit Products, LLC.

16.     The Capital Contribution Agreement provided for MLP taking title to a 99% Class A Shares ownership interest in Thermo No. 1, (the Class A Shares being made up of debt and investment tax equity); and the Raser entities retaining only a 1% Class B Shares ownership interest in Thermo No. 1. MLP took 99 % ownership so that it could securitize and sell to investors the Sections 45 and 48 Internal Revenue Code investment tax credits and the production tax credits.

6

17.     In October of 2008, upon information and belief, MLP sold and assigned 90% of the debt portion of the Thermo Note to Prudential Insurance Company of America (Prudential) and a 9% percent interest to Zurich. MLP remained a creditor and the Class A shareholder of Intermountain and Thermo No. 1 and Raser retained its 1% Class B Shares.

18.     Raser began construction of Thermo No. 1 in August of 2008. Under the terms of the financing agreement, Thermo No. 1 was required to be completed [the "Guaranteed Final Completion Date"] the *earlier* of 180 days after the "Substantial Completion Date", or before June 15, 2009. Most geothermal plants take three or four years to construct. Raser's short completion deadline is the reason that construction was rushed and begun before it was technically proven that the site contained adequate heat and flow of hot water to support the Thermo No. 1 plant.

19.     The "Substantial Completion Date" was the date when the construction was completed. The "Guaranteed Final Completion Date" was when the plant was supposed to work to at least minimum specifications of producing 6 MW of power.

20.     Thermo No. 1 was "substantially completed" in early 2009, but the plant did not work properly due to inadequate heat and flow of hot water. The Defendant Investors were forced to continuously advance into the future, the "Guaranteed Final Completion Date", because Thermo No. 1 never met the minimum functional specifications of the financing agreement's terms and conditions, namely production of a minimum of 6 MW of power. To date, Thermo No. 1 does not meet the minimum specifications. Proof that Thermo No. 1 is an utter failure is the fact that the plant must draw power from the nearby fossil fuel "brown electric power" grid to power its own turbines, pumps and other equipment. Thermo No. 1 was projected to produce 14 MW of power, but it produces no more than 2-3 MW of geothermal power, but only with the aid

7

of 3.5-4.5 MW of power imported from the brown electric grid. Thus, Thermo No. 1 consumes more power than it produces. At the time the Defendants applied for Section 1603 grant, Thermo No. 1 was not a commercially viable geothermal plant and shortly after receiving the Section 1603 grant Raser reclassified Thermo No. 1 as permanently impaired in accordance with "generally accepted accounting principles" (GAAP). The Defendants failed to advise the Energy Department of this permanent impairment, even though Defendants knew prior to their application that Thermo No. 1 was permanently impaired and was not capable of producing more power than it consumed.

21.     In 2009, Congress passed the American Recovery and Reinvestment Act. Under Section 1603 of the Act, the United States Department of the Treasury allowed payments to "eligible persons" who placed into service Specified Energy Properties during 2009, 2010 or 2011. Section 1603 promised payments to qualified applicants in the amount equal to 30% of the basis of the property. Eligible property under this program included only property used in a trade or business or held for the production of income. The purpose of the Recovery Act was to preserve and create jobs and promote economic recovery in the near term and to invest in infrastructure that will provide long-term economic benefits — none of which Thermo No. 1 accomplishes.

22.     Applicants who received payments for property under Section 1603 were not eligible for the production or investment tax credit under Sections 45 and 48 of the Internal Revenue Code with respect to the same property for the taxable year of the payment or subsequent years.

23.     In early 2009, the Conspirators were faced with a non-working geothermal property that they knew would never meet the "Guaranteed Final Completion Date"

8

specifications and would never become a commercially viable plant. The Conspirators saw the American Recovery and Reinvestment Act as a golden opportunity to obtain $32.9 million from United States Taxpayers to pay back the Defendant Investors and keep them from foreclosing on what all Defendants knew was a worthless geothermal property.

24.     The Conspirators' Thermo No. 1 plant did not qualify as a Section 1603 Specified Energy Property eligible under Section 45 of the Internal Revenue Code because Thermo No. 1 consumes more "brown power" (electricity produced from fossil fuels) to produce electricity than it is able to produce from its geothermal resource. Since Thermo No. 1 has never been a commercially viable geothermal power plant it did not qualify for a Section 1603 Grant.

25.     Notwithstanding Defendants knowledge that Thermo No. 1was impaired, that it did not work properly, that it consumed more energy than it produced and that it is not commercially viable, they submitted the false application to the Treasury Department anyway.

26.     In addition, the Defendant Investors did not qualify as "eligible persons" under the American Recovery and Reinvestment Act, because they did not construct the property and they did not place the property into service.

27.     The Defendant Investors and the Raser entities attempted to circumvent the "eligible person" requirement under the Act, by transferring Merrill's minority Class A ownership of Thermo No. 1 back to the Raser entities, so that Raser could apply for the grant as the owner of the property. This transfer was fraudulent because there is no Section 1603 provision that permits such a transfer of ownership. The Defendants made this transfer by entering into a "Membership Interest Redemption Agreement", whereby the Raser entities and MLP not only conspired to transfer ownership back to Raser, but they conspired to have all funds received from the Treasury Department placed in escrow and immediately assigned to the sole

9

benefit of the Defendant Investors, rather than the applicants, the Raser entities. Thus, the Raser entities were the "shills" for the Defendant Investors to obtain money from the United States Treasury to which they were not otherwise entitled. The Raser entities acquiesced to this agreement because otherwise, with a non-functioning property, they were in default to the Lenders.

28.     In addition, the Membership Interest Redemption Agreement specified that the transfer of ownership from MLP to the Raser entities would not take place until after three business days following the filing of the Section 1603 Grant Application. Therefore, on the day the Section 1603 application was filed, the Raser entities applicants only owned 1% of the Thermo No. 1 plant.

29.     The Defendants further falsified their Section 1603 application by not informing the Federal Government that the grant funds were previously assigned to the Defendant Investors. In violation of Section 1603 and 31 U.S.C. § 3727, Defendants falsely stated on the Section 1603 application that they were not making an assignment under 31 U.S.C. § 3727. Defendants' assignment of funds violated the Federal Assignment Claims Act (FACA) 31 U.S.C. § 3727 because all assignments of grant money under the American Recovery and Reinvestment Act Section 1603 are subject to the rules and regulations of the Federal Assignment Claims Act. The purpose of the FACA is to prevent parties from assigning contracts or claims against the federal government without the government's knowledge and consent. The prohibition was designed to minimize the government's risk of having to settle disputes among multiple claimants, to prevent the federal government from refereeing claims between possible recipients of federal funds, their creditors and business partners, and to assure that someone did not

accumulate claims against the federal government that could unduly influence the government's policies.

30.     Notwithstanding the rules and regulations of the FACA, the Raser entities conspired with the Defendant Investors to illegally assign the $32.9 million Section 1603 grant money to the Defendant Investors. The Raser entities and the Defendant Investors failed to follow the formal notice and approval rules and regulations of the FACA and they therefore, illegally assigned the Section 1603 grant money to the Defendant Investors. In addition the Conspirators, in violation of 31 U.S.C. § 3727, falsely and fraudulently stated on the Section 1603 application that they were not making an assignment of grant money under 31 U.S.C. § 3727, when in fact they were making such an assignment. The Defendant Investors were not "Financing Institutions" as defined under the Federal Assignment Claims Act (FACA) and they therefore, were not eligible for any FACA exemption. Failure to comply with the FACA has not been publicly disclosed.

31.     The Defendants further falsified their Section 1603 application by presenting the Energy Department with an inflated cost of construction on Thermo No. 1 of $108 million, far exceeding the $27 million original construction projections. The Defendants knowingly submitted false and inflated construction costs as follows:   (1)   costs that were procured by kickbacks from contractors;   (2)   costs of $4.9 million for turbine purchased from Pratt and Whitney, even though Raser never paid Pratt and Whitney for these turbines;     (3)   costs that were recorded even when invoices went unpaid;     (4)   costs that were recorded on a cash basis even when those invoices were paid in company stock rather than cash. (Raser pressured some contractors to accept payment in stock rather than cash). Raser incorporated the cash value of these invoices into its capital basis as though they were paid in cash;     (5)   improperly

reclassifying abandoned assets into capital expenses. (Raser drilled and abandoned several unsuccessful production wells in the fall and spring of 2008-2009 that it fraudulently included in its capital basis. It expensed these abandoned production wells on its balance sheet as abandoned, but when calculating its cost basis it recast the abandoned wells as "monitoring wells" and applied the cost to the Federal subsidy).

32.    Under Section 1603, the Treasury Department was only given 60 days within which to review an application and the time payment. Therefore, because of lack of time to thoroughly review the application, in February 2010 Thermo No. 1 received $32.9 million from the U.S. Treasury based on the $108 million application. These funds were received in escrow by Thermo No. 1, and because of the unlawful assignment in violation of the FACA, the funds were immediately paid to the Defendant Investors. Prudential received $27 million from the escrow and Zurich and MLE received the remainder.

33.    In June 2010, Raser declared Thermo No. 1 was permanently "impaired" for GAAP accounting and tax purposes. In reality, Thermo No. 1 was permanently impaired much earlier, by at least by March 2009 (well before the Section 1603 grant application), when the carrying value of the Thermo No. 1 plant was overstated by at least $83,000,000.

34.    Section 1603 has a recapture provision, that if the property ceases to qualify as a specified energy property within five years from the date the property is placed in service, then Section 1603 payments must be repaid to the Treasury as follows: 100% of the payment must be repaid if the disqualifying event takes place within one year from the date placed in service; 80% of the payment must be repaid if the disqualifying event takes place after one year but before two years from the date placed in service; and so on.

35.    The Raser entities filed for Chapter 11 bankruptcy protection on April 29, 2011.

12

36.    Notwithstanding the fact that Thermo No. 1 is impaired, it consumes more power than it produces and it is not commercially viable, none of the Conspirators has attempted to repay the U.S. Treasury. The Raser entities continue to operate this nonviable geothermal plant, just to give the appearance of being in compliance with the laws, so that they can attempt to avoid paying back the United States Taxpayers.

## V.    CAUSES OF ACTION

### A.   COUNT I — FEDERAL FALSE CLAIMS ACT FOR VIOLATIONS OF 31 U.S.C. 3729(a)(1)(A)

37.    *Relator* alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

38.    Conspirators knowingly presented, or caused to be presented, a false or fraudulent claim for payment under Section 1603 of the American Recovery and Reinvestment Tax Act of 2009 which caused the United States Treasury to pay grant money to Defendants which they were not otherwise entitled, as follows:

39.    Conspirators falsely and fraudulently applied for a Section 1603 grant even though they knew at the time of the application, that the Thermo No. 1 plant did not qualify as a Section 1603 Specified Energy Property eligible under Section 45 of the Internal Revenue Code, because Thermo No. 1 consumed more "brown power" (electricity produced from fossil fuels) to produce electricity than it was able to produce from its geothermal resource.

40.    Conspirators falsely and fraudulently applied for a Section 1603 grant even though they knew at the time of the application, that Thermo No. 1 did not qualify as Specified Energy Property under section 45 of the Internal Revenue Code, because Thermo No. 1 was an impaired geothermal property that did not even meet the Conspirators minimum specifications, and that it was not commercially viable. Since Thermo No. 1 has never been eligible under

13

Section 45 of the Internal Revenue Code and it is not a commercially viable geothermal power plant it did not qualify for a Section 1603 Grant.

41.     Conspirators falsely and fraudulently applied for a Section 1603 grant even though they knew at the time of the application, that the Defendant Investors were not "eligible persons" to receive payment under Section 1603. Notwithstanding this knowledge, they conspired and agreed to transfer ownership of the property back to Thermo No. 1 for the purpose of circumventing the rules and receiving payment for the sole benefit of the Defendant Investors, rather than the applicant, the Raser entities.

42.     Conspirators falsely and fraudulently applied for a Section 1603 grant even though they knew at the time of the application, that Conspirators' assignment of Section 1603 grant funds violated the Federal Assignment Claims Act (FACA) 31 U.S.C. § 3727, because they failed to comply with the FACA statute and regulations and they did not receive the required government approvals as more particularly set out in paragraphs 27, 29 and 30. In addition, the Conspirators, in violation of 31 U.S.C. § 3727, falsely and fraudulently stated on the Section 1603 application that they were not making an assignment of grant money under 31 U.S.C. § 3727, when in fact they were making such an assignment.

43.     Conspirators falsely and fraudulently applied for a Section 1603 grant even though they knew at the time of the application, that the Membership Interest Redemption Agreement specified that the transfer of ownership from MLP to the Raser entities would not take place until after three business days following the filing of the Section 1603 Grant Application. Therefore, on the day the Section 1603 application was filed, the Raser entities applicants only owned 1% of the Thermo No. 1 plant and were not eligible to receive Section 1603 grant money.

44.     Conspirators falsely and fraudulently applied for the Section 1603 grant even though they knew at the time of the application, that they inflated Thermo No. 1's cost bases in order to obtain a larger grant, as more particularly set out in paragraph 31.

45.     Notwithstanding Conspirators current knowledge that Thermo No. 1 is impaired, non-working property and not commercially viable, they knowingly have failed to repay the U.S. Treasury as required by Section 1603.

46.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Treasury for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), causing damage to the United States Treasury.

## B.  COUNT II — FEDERAL FALSE CLAIMS ACT FOR VIOLATIONS OF
### 31 U.S.C. 3729(a)(1)(B)

47.     *Relator* alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein, including paragraphs 38-45.

48.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Treasury for payment or approval in violation of 31 U.S.C. § 3729(A)(1)(B), causing damage to the United States Treasury.

## C.  COUNT III — FEDERAL FALSE CLAIMS ACT FOR VIOLATIONS OF
### 31 U.S.C. 3729(a)(1)(C)

49.     *Relator* alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

50.     Conspirators combined, conspired, and agreed together, and with unknown conspirators, to defraud the United States by knowingly causing false claims to be submitted to the United States for purpose of having those claims paid and profiting from those false claims. Conspirators combined, conspired, and agreed together to knowingly conceal or knowingly and

improperly avoid or decreased their obligation to return to the United States Treasury the funds

that were subject to repayment under the recapture provisions of Section 1603, in violation of 31

U.S.C. § 3729(a)(1)(G). Conspirators combined, conspired, and agreed together to commit other

overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. §

3729(a)(1)(C), causing damage to the United States Treasury.

### D.  COUNT IV — FEDERAL FALSE CLAIMS ACT FOR VIOLATIONS OF
### 31 U.S.C. 3729(a)(1)(G)

51.     *Relator* alleges and incorporates the allegations in the preceding paragraphs as if

fully set forth herein.

52.     By virtue of the acts described above, Defendants knowingly concealed or

knowingly and improperly avoided or decreased their obligation to return to the United States

Treasury the funds that were subject to repayment under the recapture provisions of Section

1603, in violation of 31 U.S.C. § 3729(a)(1)(G), causing damage to the United States Treasury.

Notwithstanding the fact that Thermo No. 1 is impaired, does not work and is not commercially

viable, none of the Conspirators has repaid the U.S. Treasury, as required by the American

Recovery and Reinvestment Act.

### VI.          PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT

1.     Relator respectfully requests this Court to enter judgment against Defendants, as

follows:

> (a)     That United States Government pursuant to the False Claims Act, 31 U.S.C. §
>
> 3729 *et seq.;* be granted recovery for the penalties, fines, forfeitures and
>
> damages; arising from Defendants knowingly concealing or knowingly and
>
> improperly avoiding statutory obligations to pay money or property to the
>
> Government as a result of their illegal actions, in violation of 31 U.S.C.

16

3729(a)(1)(A); 31 U.S.C. 3729(a)(1)(B); 31 U.S.C. § 3729(a)(1)(C) and 31 U.S.C. § 3729(a)(1)(G).

(b)  That the United States be awarded damages in the amount of three times the fines, penalties, forfeitures and damages sustained by the United States because of the reverse false claims and fraud alleged within this Complaint, as provided by the Civil False Claims Act, 31 U.S.C. § 3729(a)(1), 31 U.S.C. 3729(a)(1)(B); 31 U.S.C. § 3729(a)(1)(C) and 31 U.S.C. § 3729(a)(1)(G);

(c)  That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)  That the Court grant permanent injunctive relief to prevent any recurrence of violations of the laws for which redress is sought in this Complaint;

(e)  That the Relators be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)  That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rules of Civil Procedure, *Relator* demands a trial by jury.

Dated Wednesday, May 02, 2012.

/s/ *Carolyn Elefant*
Carolyn Elefant

The Law Offices of Carolyn Elefant
Carolyn Elefant D.C. Bar No. 425433
1629 K. Street N.W. Ste. 300
Washington DC 20006
1(202) 297-6100
Carolyn@carolynelefant.com

*Pending Pro Hac Vice*
Houck Law Firm, P.S.
William W. Houck D.C. Bar No. 1000790
4045 262nd Ave. SE
Issaquah, Washington 98029
(425) 392-7118
Fax (206) 337-0916
Houcklaw@gmail.com
Attorney for Relator